UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEITH DREW,

                    Plaintiff,              19-cv-4067 (JGK)

          - against -                       MEMORANDUM OPINION
                                            AND ORDER
NEW YORK CITY HEALTH AND HOSPITALS
CORP. ET AL.,
                    Defendants.

JOHN G. KOELTL, District Judge:

    The plaintiff, Keith Drew, who is proceeding pro se and in
forma pauperis, brings this action against the City of New York,
the Health and Hospitals Corporation ("H+H"), Doctors Shiblee
and Latunji, Captains Rowe, Phillips, and Knight, and Correction
Officers Dias, Pumarejo, DiCostanzo, Hosen, Rodrigues, and
Richard, and OBCC Clinic Administrator "Ricky Doe." The
plaintiff asserts claims that arose in 2019, when he was a
pretrial detainee at the Otis Bantum Correctional Center
("OBCC").[1] He asserts claims under 42 U.S.C. § 1983 for
violations of his rights under the First and Fourteenth
Amendments, including his rights to be free from excessive force
and from deliberate indifference to serious medical needs, as
well as claims under the Americans with Disabilities Act, 42
U.S.C. § 12131 et seq. ("ADA"), the Rehabilitation Act, 29

_____

    [1] The plaintiff was a pretrial detainee when he brought this
action, but he has since been released from custody.

U.S.C. § 701 et seq., and state law. The defendants[2] move to dismiss all of the plaintiff's claims except his claims that the defendants used excessive force against him.

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

---

[2] Two of the defendants were never served. Proof of service on Dr. Latunji was returned unexecuted, ECF No. 29, and on March 11, 2021, the defendants filed a suggestion of death indicating that Dr. Latunji died in March 2020, which they also mailed to the plaintiff. ECF No. 40. OBCC Administrator Ricky Doe was never identified because the plaintiff did not supply sufficient information, and this defendant therefore was never served. All other defendants have been served and join in this motion.

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

Where, as here, the plaintiff is proceeding pro se, the Court is required to read the plaintiff's pleadings "liberally and interpret them to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999).[3]

## I.

The plaintiff has filed a second amended complaint, ECF No. 38, and a supplemental complaint. ECF No. 41. Because the plaintiff is proceeding pro se, the Court also considers facts in the opposition to defendant's motion to dismiss, ECF No. 51, as supplementing these filings. See Walker v. Schult, 717 F.3d

---

[3] Unless otherwise noted, this Opinion omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion."). Collectively, the second amended complaint, supplemental complaint, and facts in the opposition constitute the operative complaint ("Complaint").[4]

The following factual allegations are accepted as true for purposes of this motion. When the plaintiff arrived at OBCC on January 29, 2019, he disclosed at his initial health examination that he suffers from Chronic Obstructive Pulmonary Disease (COPD), depression, and schizoaffective disorder. Opp. at 3, 7. The plaintiff takes two medications, Atrovent and Q-Var, four times daily for his COPD. Id. at 4. The plaintiff had prescriptions for these medications, and on February 14, 2019, he "followed appropriate protocol" at OBCC in an effort to fill the prescription id., but Dr. Towhid Shiblee denied the plaintiff "adequate medical treatment" for his COPD. Compl. ¶ 69. The plaintiff attaches a Correctional Health Services (CHS) form titled, "Request for a Second Opinion," dated February 14, 2019, with his signature that states that the health care provider at sick call that day "refused to provide refills for Atrovent and Q-Var asthma treatment without reasonable or legitimate justification." Id. Ex. 3C; see also id. ¶¶ 68-72.

---

[4] Citations to "Compl.", however, refer only to ECF No. 38.

The plaintiff was reassigned to Dr. Michael Latunji, who prescribed a rescue inhaler with Albuterol that same day, February 14, 2019, without seeing or examining him. Opp. at 5.

On February 16, 2019, the plaintiff "went to the main clinic again in an attempt to fill his prescriptions" for Atrovent and Q-Var, but Dr. Latunji denied his request, and sent him away. Id. Later the same day, the plaintiff was transported to OBCC's main health clinic on a stretcher, after having fallen down a flight of stairs, Compl. ¶ 21, and suffered an asthma attack, Opp. at 4.[5] Dr. Latunji was on duty, and the plaintiff asked to see a different medical provider because of his encounter with Dr. Latunji earlier that day. Id. at 5-6. Dr. Latunji did not do "a routine medical examination or vital sign review," Compl. ¶ 73, and "failed to provide Plaintiff with any type of adequate medical treatment," id. ¶ 60, or offer any "real justification for denying Plaintiff medical care related to his fall injuries or COPD." Opp. at 6. The plaintiff "requested an X-ray examination," but Dr. Latunji did not perform one. Id. The plaintiff's "medical record indicates two

---

[5] The plaintiff alleges that he "suffered an asthma attack after falling down several stairs and suffered from symptoms of his COPD that could not be treated with an emergency inhaler alone." Opp. at 4.

(2) separate medical needs occurring on February 16, 2019," but Dr. Latunji "refused to treat either condition."[6] Compl. ¶ 86.

The plaintiff "refused to leave the clinic without first being examined by another medical provider," and Dr. Latunji eventually requested that the plaintiff be forcibly removed. Opp. at 6. At some point, the plaintiff told Captain Rowe and other officers present that he "could not walk" and that he was requesting "hospital treatment." Compl. ¶ 24. During the attempt to remove the plaintiff from the clinic, he began taking off his pants and urinating on the floor. Opp. at 6. Captain Rowe eventually authorized Correction Officers Pumarejo, DiCostanzo, and Dias to use "unreasonable or excessive quantities of" a chemical agent against the plaintiff. Compl. ¶¶ 43, 81.

"Chemical compound residuals remain[ed] in Plaintiff's ear canals for an indeterminate period of time." Id. ¶ 82. Due to a "lack of water pressure" in the plaintiff's housing unit, he was unable to clean out all of the residue of the chemical compounds. Opp. at 6. This exposure to excessive chemicals

---

[6] Dr. Latunji waited until March 19, 2019, to complete medical records regarding the plaintiff's February 16, 2019, visit. Id. ¶ 61. Dr. Latunji's notes state that the plaintiff was found lying on the floor and that "he claimed he had an asthma attack." Id. Ex. 4B. The notes, which were completed on March 19, 2019, state that the plan is to "start Q-Var Redihaler Aerosol." Id.

6

caused the plaintiff to lose "all hearing capabilities in both ears." Compl. ¶ 63.

Attached to the second amended complaint is a report and notice of infraction, indicating that the plaintiff was charged with disrespect for staff, disorderly conduct, refusing to obey a direct order, creating a health and safety hazard, assault, and a sex offense. Id. Ex. 2C.[7] The plaintiff alleges that Captain Rowe conspired with Correction Officers Dias, Pumarejo, and Di Costanzo to retaliate against the plaintiff by placing him in a holding pen known as a "Why Me Pen," which did not have water or toilet facilities. Id. ¶ 65. The plaintiff states that this treatment was commonly referred to as "The Burn" or being "on the burn." [8] Id. ¶ 64. Captain Rowe's retaliation against the plaintiff was allegedly based on the plaintiff's having requested a second medical opinion. Id. ¶ 87.

---

[7] Attached to the complaint is a document titled, "Inmate Voluntary Statement Form," which is signed by Captain Rowe and states that on February 16, 2019, the plaintiff refused to provide a statement. The plaintiff alleges that Captain Rowe never provided him an opportunity to make a statement. Compl. ¶ 25.

[8] The plaintiff notes that he previously filed suit against the City of New York in connection with its policy of placing inmates "on the burn," which resulted in a settlement. Second Amended Complaint, Drew v. City of New York, 18-cv-8529 (S.D.N.Y. Dec. 14, 2020) (alleging that defendants denied the plaintiff medical treatment, called him a pedophile in front of other detainees, used pepper spray indiscriminately against him and others in a holding pen, and placed him "on the burn" without access to water or toilet facilities).

On February 18, 2019, Captain Rowe "threaten[ed the plaintiff's] safety by labeling [him a] child molester" in the presence of other detainees, who then cornered the plaintiff in the dayroom; the detainees demanded that the plaintiff show them paperwork about his criminal proceedings that would refute Captain Rowe's allegation that Plaintiff was a child molester. Id. ¶ 28.

Captain Rowe investigated the use of force event, even though she had been involved in it. Captain Knight "should have known that . . . state law mandates Plaintiff be provided actual notice of misbehavior." Id. ¶ 46. Moreover, Captain Knight "commanded that defendant Officer Hosen . . . sign his name to perjured and false statements" in connection with the investigation. Id. ¶ 47.

A hearing was held on February 21, 2019, on the disciplinary charges against the plaintiff arising from the events at the medical clinic on February 16, 2019. The plaintiff contends that he was denied "notice and the opportunity to present evidence." Id. ¶ 53, and a "meaningful opportunity to confront and be heard" at the hearing. Id. ¶ 49. Officer Richard also denied the plaintiff "the opportunity to be heard" while they "view[ed] the surveillance footage together" during the disciplinary hearing. Id. ¶ 50. The plaintiff was found guilty of one or more charges and assessed a penalty of 30 days'

punitive segregation and a $25.00 surcharge. Id. ¶ 53. The plaintiff later brought a petition under CPLR Article 78, and the February 21, 2019, disciplinary determination was allegedly expunged.[9] Id. ¶ 56. The Department of Corrections, ("DOC"), pursuant to an allegedly unlawful policy, has retained the plaintiff's $25.00 surcharge even after his disciplinary decision was allegedly expunged. Id. ¶ 57.

In March 2019, a medical provider prescribed Q-Var and Atrovent to the plaintiff to manage his COPD. Opp. at 6. The plaintiff was thereafter transferred to the George R. Vierno Center and then into the custody of the New York State Department of Corrections and Community Supervision, id. at 7, and he has since been released.

The plaintiff contends that the City of New York has failed to provide meaningful rules: (1) for using chemical substances on those who, like the plaintiff, have been diagnosed with respiratory conditions, Compl. ¶ 89; and (2) for detainees to seek a second medical opinion. Id. ¶ 90.

The plaintiff asserts § 1983 claims against the defendants for violations of his rights under the First and Fourteenth Amendments (against individuals and municipal entities), as well

---

[9] Defendants indicate that they located no record that the disciplinary decision was expunged. Mot. at 17.

as claims under the ADA and Rehabilitation Act, and state law.
The plaintiff seeks damages and unspecified injunctive relief.

                                    II.

        The defendants move to dismiss the plaintiff's § 1983
claims for violations of his rights under the First and
Fourteenth Amendments. The defendants also move to dismiss the
plaintiff's claims under the ADA and the Rehabilitation Act, and
his claims for municipal liability against the City of New York
and H+H. The defendants expressly state that they are not moving
to dismiss the plaintiff's claims that he was subjected to
excessive force in violation of his constitutional rights.
Memorandum of Law in Support of Motion to Dismiss, ECF No. 44
("Mot."), at 1 n.2.

                        **A. First Amendment Claim**

        To plead a claim for retaliation in violation of the First
Amendment, a plaintiff must plausibly allege that: (i) he
engaged in constitutionally protected speech or conduct; (ii) a
defendant took adverse action against him; and (iii) the
protected activity and adverse action are causally connected.
Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015).

        The defendants move to dismiss the plaintiff's claim that
he was retaliated against, in violation of the First Amendment,
for seeking a second medical opinion. The defendants argue that
the allegedly adverse actions against the plaintiff, namely, the

                                    10

disciplinary charges and placing the plaintiff in holding pens,
were not the result of any protected First Amendment activity
but were the result of the plaintiff's admitted disciplinary
infraction of removing his pants and urinating in the clinic.
Mot. at 16. The plaintiff does not dispute that he did so. Opp.
at 6. The defendants argue that nothing in the Complaint
suggests that the disciplinary charges were imposed for any
reason other than the undisputed fact that the plaintiff took
off his pants and urinated in the medical clinic, and that the
plaintiff has therefore failed to state a plausible claim for
retaliation.

The plaintiff did not respond at all to the defendants'
argument to dismiss the plaintiff's claims of First Amendment
retaliation. That claim is therefore dismissed without prejudice
to the ability of the plaintiff to plead a plausible claim of
First Amendment retaliation.

## B. Claim for Deliberate Indifference to Unconstitutional Conditions of Confinement

The plaintiff captioned his first count "Condition of
Confinement." "A pretrial detainee's claims of unconstitutional
conditions of confinement are evaluated under the Due Process
Clause of the Fourteenth Amendment, rather than the Cruel and
Unusual Punishments Clause of the Eighth Amendment," because
pretrial detainees "have not been convicted of a crime and thus
may not be punished in any manner — neither cruelly and

11

unusually nor otherwise." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017).

To state a claim for deliberate indifference to unconstitutional conditions of confinement under the Fourteenth Amendment's Due Process Clause, a plaintiff must satisfy two elements: an "objective" element and a "mental" element. First, the plaintiff must allege an "objective" element, which requires a showing that the challenged conditions are sufficiently serious. The standard for this objective element is the same under the Fourteenth Amendment as under the Eighth Amendment: "either alone or in combination, [the conditions must] pose an unreasonable risk of serious damage to [the detainee's] health" or safety, which "includes the risk of serious damage to 'physical and mental soundness.'" See Darnell, 849 F.3d at 30–31. Second, the plaintiff must allege a "mental" element, which requires a showing that the officer acted with at least deliberate indifference to the challenged conditions, meaning that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Id. at 29, 35.

The same analysis extends to claims of deliberate indifference to serious medical needs. See Charles v. Orange Cnty., 925 F.3d 73, 85-87 (2d Cir. 2019) (finding that, "when the state takes a person into custody, severely limiting his ability to care for himself," a serious medical need may be an objectively serious condition of confinement).

The plaintiff alleges that the defendants were deliberately indifferent, on several occasions, to his serious medical needs. The plaintiff also alleges that he was confined in a holding pen and that certain defendants publicly labeled him a child molester.

**1.**

Where a prisoner alleges that the defendant failed to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious by asking whether the condition "may produce death, degeneration, or extreme pain, . . . whether a reasonable doctor or patient would find [it] important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether [it] inflicts chronic and substantial pain." Charles, 925 F.3d at 86. When medical treatment was provided, but a complaint alleges that treatment was delayed or inadequate, courts look to "the severity of the temporary deprivation alleged by the prisoner," not "the

13

severity of the prisoner's underlying medical condition." Smith
v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003); see also
Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006).

### i) Denial of Prescription Refill on February 14, 2019

The plaintiff's first medical claim is that on February 14,
2019, he attempted to refill his prescriptions for Q-Var and
Atrovent, but Dr. Towhid Shiblee denied him "adequate medical
treatment." Compl. ¶ 69. In the plaintiff's CHS "Request for a
Second Opinion," dated February 14, 2019, he states that the
health care provider at sick call that day "refused to provide
refills for Atrovent and Q-Var asthma treatment without
reasonable or legitimate justification." Id. Ex. 3C; see also
id. ¶¶ 68-72. That same day, apparently after the plaintiff's
second opinion request, he was reassigned to Dr. Michael
Latunji, who prescribed a rescue inhaler with Albuterol for the
plaintiff's COPD, which is not "typically prescribed for the
ongoing maintenance of COPD". Opp. at 5. Dr. Latunji did so
"without seeing or examining" the plaintiff. Id. The plaintiff
thus asserts a claim against Dr. Shiblee for failing to provide
treatment and a claim against Dr. Latunji for providing the
wrong (or less effective) treatment and doing so without any
examination.

Respiratory ailments such as COPD and asthma are
potentially serious conditions that "a reasonable doctor or

14

patient would find . . . important and worthy of treatment."
Charles, 925 F.3d at 86. Here, however, it appears that the
plaintiff suffered a delay in treatment on February 14, 2019,
rather than denial of treatment, because he was reassigned to
another doctor who prescribed an alternative treatment that same
day. Opp. at 5. Nothing in the Complaint suggests that the
temporary delay of less than one day in receiving some treatment
presented an objectively serious risk. The plaintiff's
allegations that Dr. Shiblee denied him refills of Q-Var and
Atrovent but that he received an emergency rescue inhaler the
same day are insufficient to state a claim that he faced an
objectively serious risk of harm to which the defendants were
deliberately indifferent. Moreover, this slight delay in
treatment cannot support a finding that the mental element of a
deliberate indifference claim is met. See Sonds v. St. Barnabas
Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y.
2001) (finding that a 3½-hour delay could not support a
deliberate indifference claim).

The plaintiff also alleges that there was a 35-day delay,
from February 14, 2019, to March 19, 2019, before he received
refills for Q-Var and Atrovent,[10] and that, during that period,

---

[10] Dr. Aung Khine Oo's March 13, 2019 medical report lists
the plaintiff's current medications as including Atrovent and Q-
Var. Compl. Ex. 4C. The plaintiff thus seems to provide
conflicting information about whether his prescriptions were

15

he had at least one asthma attack (on February 16, 2019). The
plaintiff states that Q-Var and Atrovent are medications to be
taken on an ongoing basis to control COPD, in contrast to the
rescue inhaler with albuterol that he was given, which is for
emergency situations. Opp. at 5. The plaintiff alleges that
because he did not receive his COPD medication, he "experienced
symptoms of asthma such as difficulty breathing, wheezing/
coughing, chest tightness, and shortness of breath. As a result,
the plaintiff found it difficult to perform basic daily tasks
such as walking up the stairs or engaging in physical exercise
or activity." Opp. at 8. However, such symptoms typically cannot
support a finding of serious medical need. See, e.g., James v.
Brown, No. 14-cv-1767, 2016 WL 3945688, at *1, *6 (S.D.N.Y. July
19, 2016) (allegations of shortness of breath for over a month
did not constitute a "serious medical condition"); Bost v.
Bockelmann, No. 9:04-cv-0246, 2007 WL 527320, at *9 (N.D.N.Y.
Feb. 20, 2007) (collecting cases supporting the proposition that
asthma is only serious enough to support a deliberate
indifference claim when a person has an asthma attack, as
opposed to ongoing low-level symptoms). The plaintiff also
alleges that he had an asthma attack after falling down a flight
of stairs, but he concedes that this attack was promptly treated

---

filled before March 13 or not until March 19, although this does
not change the analysis.

with an inhaler. He thus does not allege sufficiently serious
contemporaneous suffering to constitute a serious medical
condition. Because the plaintiff also does not allege any
medical consequences flowing from this temporary lapse in
treatment, he does not allege a medical condition serious enough
to constitute an unconstitutional condition of confinement.

### ii) February 16, 2019, Fall and Asthma Attack

The plaintiff's second medical claim is that when he fell
and suffered an asthma attack on February 16, 2019, Dr. Latunji
did not do "a routine medical examination or vital sign review,"
Compl. ¶ 73, and "failed to provide Plaintiff with any type of
adequate medical treatment," id. ¶ 60, or offer any
"justification for denying Plaintiff medical care related to his
fall injuries or COPD." Opp. at 6.[11]

---

[11] The plaintiff attaches a medical report for February 16,
2019, that includes the following description from Nurse
Tillary: The patient was found lying on the floor "reporting
asthma" but he was "without respiratory distress." He was
"combative" and "using profanity" and "refuse[d] peak flow"
meter. Compl. Ex. 4B. Entries with Nurse Tillary's name document
the plaintiff's blood pressure, pulse, temperature, and "RR," as
of 3:00 p.m. on February 16, 2019. Id.

In the same report, Dr. Latunji writes that the plaintiff
was found "in recumbent position in no acute distress but he
claimed he has [sic] an asthma attack. In the clinic his vital
signs found to be normal. . . . No treatment indicated as not
[sic] injury noted." Id. The plaintiff points out that Dr.
Latunji did not sign the report until March 19, 2019, one month
after the incident, and seems to argue that this delay shows Dr.
Latunji's subjective deliberate indifference. Id.

The plaintiff alleges that he had an asthma attack after his fall down the stairs and that he had "serious medical needs," but he does not allege any facts to support this conclusion. Although the plaintiff states that he told correction officers at the clinic that he needed an X-Ray and to go to the hospital, the medical records do not reflect any injury or other serious need. The plaintiff alleges that he "suffered from symptoms of his COPD that could not be treated with an emergency inhaler alone," Opp. at 4, but he does not elaborate on the nature of those symptoms. Without further detail, the Court cannot conclude that the plaintiff has alleged a serious medical need arising from his fall. See Vogelfang v. Capra, 889 F. Supp. 2d 489, 505 (S.D.N.Y. 2012). The plaintiff has therefore failed to provide sufficient factual allegations that he had an objectively serious injury on February 16, 2019, to which Dr. Latunji was deliberately indifferent.

### iii) Loss of Hearing from Chemical Residue

The plaintiff's third medical claim is that he received inadequate medical treatment to remove chemical residue from his ears, and he eventually lost hearing in both ears. It is unclear against whom this claim is asserted. Because the defendants have not moved to dismiss the plaintiff's claim for the alleged use of excessive force against him, the use of the chemical agent is not at issue.

The plaintiff has not adequately pleaded the mental element of his claim for deliberate indifference to serious medical needs. The plaintiff does allege that there was a serious condition: the chemical residue in his ears, which he alleges led to deafness, a permanent medical consequence. See Charles, 925 F.3d at 86. He also plausibly alleges that this condition and the fact that it required treatment were known to certain defendants, because he alleges that Dr. Latunji recommended decontamination. Compl. Ex. 2. And he alleges that he did not actually receive the medical treatment he required after the chemical spray on February 16, 2019.[12] Suppl. Compl. ¶ 3.

However, the plaintiff does not allege that the defendants knew or should have known that the risk from not washing out the plaintiff's ears was serious. See Ross v. Willis, No. 16-cv-6704, 2021 WL 3500163, at *18 (S.D.N.Y. Aug. 9, 2021); Purdie v. City of New York, No. 10-cv-5802, 2011 WL 1044133, at *4 (S.D.N.Y. Mar. 15, 2011). Absent an allegation that the plaintiff informed the defendants that he was inadequately decontaminated or that the chemicals were causing him pain, there is no allegation that the defendants should have known of

---

[12] The plaintiff attaches a medical report from Dr. Latunji, signed on March 19, 2019, which states that "Patient was involved in DOC use of force in the main clinic treatment room and OC was utilized. Patient refused physical examination and vital signs. No visible injury noted. . . . [N]o acute distress. . . . Decontamination advised." Compl. Ex. 4B.

an ongoing serious medical need. See Mago v. Finnucan, No. 3:20-cv-1466, 2021 WL 171040, at *4 (D. Conn. Jan. 19, 2021); Deegan v. Doe #1, No. 3:19-cv-1356, 2019 WL 5964816, at *5 (D. Conn. Nov. 13, 2019).

The plaintiff alleges that on March 13, 2019, Dr. Aung Khine Oo "completed a medical chart," Opp. at 6, but observed no 'inflammation or chemical agent residue in plaintiff's ear." Compl. Ex. 4C.[13] But he does not allege any step that Dr. Oo should have taken at this point. He thus does not allege an objectively serious medical need that was not met, and therefore also has not alleged deliberate indifference to that medical need.

Therefore, the plaintiff has failed to allege that any defendant knew or should have known about a serious medical need that was neglected. The plaintiff's claim for the denial of medical care in connection with chemical residue in his ears is therefore dismissed.

---

[13] The plaintiff attaches Dr. Aung Khine Oo's March 13, 2019, report to his complaint; Dr. Oo's statement, read in its entirety, appears to be to the contrary: "[N]o sign of infection, inflammation or chemical agent resideual [sic] seen. Wax in both ear." Compl. Ex. 4C. For purposes of the motion to dismiss, however, the Court assumes that the plaintiff had residue in his ear. See Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 305 (2d Cir. 2021) ("[T]reating an exhibit as part of the pleading does not require accepting the contents of the exhibit as true.").

**2.**

"Conditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." Darnell, 849 F.3d at 30. Alongside the allegations directly relating to his medical needs, the plaintiff also alleges that he was confined in a holding pen with no toilet or running water, and that certain defendants publicly labeled him a child molester, thereby causing him to be in danger from other inmates. But these conditions do not mutually reinforce one another: the plaintiff does not allege that the allegedly unsanitary conditions in the holding pen or the threat from being labeled a child molester worsened, or were worsened by, each other, or exacerbated the plaintiff's asthma or COPD. See Wilson v. Seiter, 501 U.S. 294, 304 (1991); cf. Schult, 717 F.3d at 127 (finding that the "[una]vailability of hygienic materials" could be an unconstitutional condition of confinement where it amplified "otherwise unsanitary living conditions"). The plaintiff does appear to allege that "The Burn" was partially responsible for his hearing loss. Compl. ¶ 87. However, he does not explain what the causal connection might be. See Andres v. Town of Wheatfield, No. 17-cv-377, 2019 WL 2491949, at *4 (W.D.N.Y. June 14, 2019). Accordingly, his

21

allegation of causation is conclusory, and cannot support a
finding that "The Burn" and the allegedly inadequate medical
care he received were mutually enforcing conditions that could
be aggregated to amount to an unconstitutional condition of
confinement.

It is possible that the plaintiff, in making these
additional allegations, was trying to raise additional,
standalone claims of deliberate indifference to unconstitutional
conditions of confinement. See, e.g., Darnell, 849 F.3d at 30
(depending on their severity and duration, unsanitary conditions
could support a claim for deliberate indifference to
unconstitutional conditions of confinement); Willey v.
Kirkpatrick, 801 F.3d 51, 66-68 (2d Cir. 2015) (same); cf.
Bouknight v. Shaw, No. 08-cv-5187, 2009 WL 969932, at *4
(S.D.N.Y. Apr. 6, 2009) ("[A] prisoner can state a claim [for
failure to protect] . . . against a corrections officer who
spreads malicious rumors about him if the rumors incite[] other
inmates to assault the plaintiff, thereby placing him at grave
risk of physical harm."). However, the plaintiff's threadbare
allegations alone do not suffice to state additional standalone
claims, and indeed the defendants did not construe them as such
in their motion to dismiss. To the extent the plaintiff is
attempting to raise a claim that he was subjected to
unconstitutional conditions of confinement based on the

conditions in "the Burn" or the alleged unsuccessful effort to incite inmates against him, the claim is dismissed without prejudice.

### C. Due Process in Disciplinary Hearing

The defendants move to dismiss the plaintiff's due process claim. The plaintiff did not respond at all to the defendants' arguments to dismiss the plaintiff's claim for violation of due process. That claim is therefore dismissed without prejudice to the ability of the plaintiff to plead a plausible claim for violation of due process.

### D. Municipal Liability

The plaintiff seeks damages against the City of New York and H+H, which are governmental entities. A governmental entity can be held liable under § 1983. Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978). However, to hold a governmental entity liable under § 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. Id. at 691. The plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. See Connick v. Thompson, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."). Thus, to state a § 1983 claim

against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403-04 (1997).

Municipal liability can attach based on an informal policy, custom, or practice if it is "so widespread as to have the force of law." Brown, 520 U.S. at 404. Municipal liability can attach based on a failure to train or supervise if that failure "amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." See City of Canton v. Harris, 489 U.S. 378, 388 (1989). In either case, to permit an inference of a policy, custom, or practice, a "single incident alleged in a complaint, especially if it involved only actors below the policymaking level," generally will not suffice to raise an inference of the existence of a custom or policy." Dyno v. Vill. of Johnson City, 240 F. App'x 432, 434 (2d Cir. 2007). A plaintiff cannot merely conclusorily "state that a municipal policy or custom exists. Rather, a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." See Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

In this case, the plaintiff alleges that the DOC has a "custom and practice of failing to protect from harm, specifically, the use of excessive force . . . and denial of medical care," Compl. ¶ 14; a policy of denying access to second medical opinions, id. ¶¶ 77-79; and a policy of failing to train, supervise, or discipline its employees, id. at ¶¶ 10-12, 30, 63, 71.

However, with respect to all of these alleged policies, the plaintiff alleges only the violations that allegedly occurred to him. The Court cannot infer a custom, policy, or practice from the plaintiff's ostensibly individual experiences. See Santos, 847 F. Supp. 2d at 576. Accordingly, the plaintiff has not pleaded with sufficient particularity a claim for municipal liability.

**E. Claims Under the ADA and Rehabilitation Act**

Title II of the ADA prohibits a "public entity" from discriminating against a "qualified individual with a disability" on account of that individual's disability. See Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 208 (1998). To state a plausible claim under Title II of the ADA, a plaintiff must allege "that (1) he or she is a qualified individual with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities or

25

was otherwise discriminated against by defendants, by reason of plaintiff's disabilities." Shomo v. City of New York, 579 F.3d 176, 185 (2d Cir. 2009). To plead a claim under Section 504 of the Rehabilitation Act, a plaintiff must plead these same facts, and additionally must allege that the entity denying the plaintiff participation or enjoyment receives federal financial assistance. Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003). Courts routinely dismiss, under the third prong of this test, ADA and Rehabilitation Act suits "by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." See Crosby v. Petermann, No. 18-cv-9470, 2020 WL 1434932, at *12 (S.D.N.Y. Mar. 24, 2020).

In this case, the plaintiff has not alleged that he was excluded from participation in any program or activity because of his disability. While the plaintiff claims that he was denied adequate medical care, he does not allege that the denial of medical care was "by reason of disability," and he therefore fails to state a claim under the ADA or the Rehabilitation Act. See id.; Maccharulo v. New York State Dep't of Corr. Servs., No. 08-cv-301, 2010 WL 2899751, at *5 (S.D.N.Y. July 21, 2010) ("[N]either the ADA nor Rehabilitation Act provides a cause of action for challenges to the quality of health services provided or for allegations of negligent medical malpractice."). The

plaintiff alleges that the "defendants made it difficult for plaintiff to access medical services available to all other incarcerated individuals at OBCC," Opp. at 8, but does not allege what "medical services available to all" he was unable to access. As such, this allegation is purely conclusory, and is insufficient to state a claim. See Iqbal, 556 U.S. at 678. Accordingly, the plaintiff's ADA and Rehabilitation Act claims are dismissed.

## F. Leave to Amend

The plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. See Robinson v. Goulet, 525 F. App'x 28, 30 (2d Cir. 2013). The Court of Appeals for the Second Circuit has cautioned that district courts "should not dismiss [a pro se complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)). Because the plaintiff may be able to allege additional facts to replead one or more of his claims, in addition to his claim of excessive force, the plaintiff may file a motion to file an amended complaint.

27

If the plaintiff chooses not to file an amended complaint, the matter will proceed solely on the plaintiff's claims that the defendants used excessive force against him.

However, the claims against Dr. Latunji are dismissed with prejudice. Under Rule 25(a)(1), if a party does not make a motion "within 90 days after service of a statement noting the death [of a party], the action . . . against the decedent must be dismissed." On March 11, 2021, well over 90 days ago, the City of New York filed and mailed to the plaintiff a suggestion of death as to Dr. Latunji. No party has made a motion under Rule 25. Accordingly, the claims against Dr. Latunji are dismissed with prejudice.

## Conclusion

The Court has considered all of the arguments by the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the reasons explained above, the defendants' partial motion to dismiss the second amended complaint is granted, and the plaintiff's claims (with the exception of the claims for excessive force) are dismissed without prejudice to the filing of a third amended complaint. The plaintiff may file a motion to file an amended complaint within thirty days of the date the plaintiff receives this Order, showing how the third amended complaint will cure the numerous defects identified above. The Clerk is directed to

close ECF No. 43. If the plaintiff chooses not to file a third amended complaint, the matter will proceed solely on the plaintiff's claims for excessive force.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. Cf. Coppedge v. United States, 369 U.S. 438, 444–45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

The Clerk is directed to mail a copy of this Order to the pro se party and to note service on the docket.

SO ORDERED.
Dated:      New York, New York
            January 5, 2022

                                    John G. Koeltl
                            United States District Judge